# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LADON E. HILL, | ) |
| | ) |
|       **Plaintiff,** | ) |
| | ) |
| v. | )   Case No. 17-CV-0227-CVE-JFJ |
| | ) |
| MEMORIAL DRIVE UNITED | ) |
| METHODIST CHURCH, | ) |
| | ) |
| | ) |
|       **Defendant.** | ) |

## OPINION AND ORDER

Now before the Court is Defendant Memorial Drive United Methodist Church's Motion for Summary Judgment and Brief in Support (Dkt. # 37). Defendant Memorial Drive United Methodist Church (MDUMC) argues that plaintiff's employment as a youth minister was terminated after plaintiff engaged in numerous incidents of hostile and insubordinate behavior, and MDUMC seeks summary judgment on plaintiff's claims of racial discrimination and retaliation. Dkt. # 37. Plaintiff responds that MDUMC's stated reason for terminating his employment was pretextual, and he claims that MDUMC retaliated against him for filing a charge of discrimination even after his employment was terminated. Dkt. # 40.

## I.

In 2004, MDUMC hired Ladon Hill as a part-time youth minister. Hill is an African-American male. Dkt. # 37-1, at 2. Shawna Genshaw, MDUMC's director of children and youth services, was taking a leave of absence in 2012, and Hill was specifically instructed to state that Genshaw "is taking time off to deal with personal issues" if asked about Genshaw's absence. Dkt. # 37-2, at 1. However, Hill told members of MDUMC that Genshaw was on "study leave" and he

admits that he departed from MDUMC's instructions. Dkt. # 37-1, at 20-21. On October 9, 2012, MDUMC terminated Genshaw's employment and Hill became upset. Dkt. # 37-3, at 2. Hill threw a five-pound ankle weight against the wall and "almost tore a door off the hinge," and he said that he felt "like I want to rip somebody's head off." Dkt. # 37-1, at 12-14. On October 28, 2012, Hill grabbed a microphone during a church service, and he told the congregation that Genshaw "was fired from [MDUMC] for no reason." Id. at 18. Hill submitted an article for publication in the church bulletin, proposing a meeting in which parents and youth could voice their concerns, and the article stated that it "is time to RISE!" Dkt. # 37-4, at 1. MDUMC's pastor, Sharon Fletcher-Taylor, reviewed Hill's submission and found that it could not appear in the church bulletin as submitted, because the article did not promote reconciliation, healing, and forgiveness. Id. In a separate e-mail, Hill explained that he was upset at the treatment of Genshaw, and he stated that was speaking to MDUMC members about the perceived mistreatment of Genshaw. Id. at 2. On November 11, 2012, Hill failed to properly supervise approximately eight to ten youths in violation of MDUMC's safe sanctuary policy, and the youths interrupted a church service. Dkt. # 37-5.

On November 12, 2012, the Staff Parish Relations Committee learned that Hill had sent a text message to a large group of church members in which he advised people that he was meeting with the pastor the next day, and he believed that his employment with MDUMC would be terminated. Dkt. # 37-11. Hill claimed that he had been bullied by Fletcher-Taylor and he referred to her as "Bane," a villain from the Batman comic books. Id. The notes from the committee meeting show that they did not want to terminate Hill's employment, but there was concern that Hill's conduct was harming MDUMC. Id. Members of the committee expressed a desire to retain Hill as an employee if he could move on from his feelings over Genshaw's termination. Id. In his

2

deposition, Hill testified that Fletcher-Taylor bullied all MDUMC employees, and that many other employees had resigned because of Fletcher-Taylor's conduct. Dkt. # 37-1, at 7-8. Hill did not testify that Fletcher-Taylor singled out African-American employees for alleged bullying, and he testified that "everyone had been fed up with the bullying . . . ." Id. at 8. On November 13, 2012, Hill met with Fletcher-Taylor and was handed five employee warning notifications, which concerned the events that occurred in October and November of 2012. Dkt. # 37-5; Dkt. # 37-6; Dkt. # 37-7; Dkt. # 37-8; Dkt. # 37-9. Hill did make written remarks on some of the notifications, but he did not deny that the conduct occurred. Hill's employment was not terminated on November 13, 2012, even though he claims that he was not willing to move on until "justice is done." Dkt. # 37-1, at 32.

On December 9, 2012, Hill had an argument with a parent whose son was in Hill's youth group at the church. The argument concerned MDUMC's treatment of Genshaw. Id. at 37-38. Hill admits that he used "some language" and the parent attempted to obtain a restraining order against Hill. Id. at 38. MDUMC placed Hill on 30 days of unpaid administrative leave after the incident, and Hill was instructed that he could not communicate with any church member about his employment or participate in youth activities during the suspension. Dkt. # 37-12. Hill was warned that violating this condition of his suspension could result in the termination of his employment. Id. Hill admits that he violated the MDUMC's instructions and that he communicated with church members about his suspension. Dkt. # 37-1, at 42; Dkt. # 37-3. Hill returned from his suspension and, on January 27, 2013, he informed the new director of children and youth services that he would be taking over youth lessons for several weeks. Parents expressed concern that Hill was trying to

3

push the new director out of the way, and plaintiff told the new director that "if anybody thought that, they could take those thoughts and stick it."  Dkt. # 37-1, at 46; Dkt. # 37-3, at 5.

MDUMC implemented a new van policy on February 1, 2013.  MDUMC personnel were no longer permitted to transport children for activities outside of a two mile radius of the church.  Dkt. # 37-13.  Hill strongly disagreed with the new policy, and sent several e-mails expressing his disagreement.  Dkt. # 37-14.  Hill stated that "90 percent of our youth live more than 2 miles from this church," and he believed that many children would no longer be able to attend the church.  Id. at 2-3.  Hill did not advise anyone at MDUMC that the van policy would disproportionately or unfairly harm minority children.  Fletcher-Taylor responded to Hill and encouraged him to help the children locate churches closer to home if they could no longer attend the church.  Id. at 2.  MDUMC terminated Hill's employment on February 10, 2013, and he was advised to return his keys and collect his final check on February 12, 2013.  Dkt. # 40-1, at 28.

Even though Hill's employment was terminated, he remained a member of MDUMC and he continued to attend church services and activities.  Hill received an e-mail from the district youth leader to attend a meeting on March 3, 2013, and he attended the meeting without advising anyone that he had been fired by MDUMC.  Dkt. # 40-2, at 7.  Hill retained an attorney and, on March 27, 2013, his attorney sent a letter to representatives of the Methodist Church in Oklahoma threatening to file suit alleging racial discrimination if Hill was not reinstated by April 10, 2013.  Dkt. # 40-6.  Hill's attorney did not send the letter directly to MDUMC, but the letter was sent to the regional office for the United Methodist Church.  Dkt. # 40-7.  Counsel for MDUMC did not receive a copy of the letter until April 8, 2013, and he investigated Hill's allegations of racial discrimination.  Dkt. # 40-8.  MDUMC's attorney sent a letter to Hill's attorney stating that Hill was terminated for

4

"insubordination, wanton destruction of church property, willful disturbance and interruption of worship services, dereliction of duty and violations of the denomination's safe sanctuary policies." Id. MDUMC had also learned that Hill attended a district youth council meeting on March 3, 2013 and held himself out as a representative of MDUMC. Id.

On April 24, 2013, MDUMC sent a letter to its members after learning that Hill was holding himself out as an MDUMC employee stating that:

> Donny Hill is no longer an employee nor is he a sponsor of [MDUMC]'s youth ministry. Parents or guardians who allow their child to go with him are hereby notified it is not a church sanctioned event and MDUMC will not be responsible for any circumstance that happens.

Dkt. # 40-9, at 1. The April 26, 2013 church bulletin further advised MDUMC members that Hill had formed a new youth group known as the "Dark Knights," and had attended a district youth council meeting where he led people to believe that he represented MDUMC. Dkt. # 40-13, at 2. The bulletin also repeated the same notice from the April 24, 2013 letter that Hill was no longer an MDUMC employee. Id. Hill was not permitted to attend a district youth council meeting in April 2013 "due to lawsuits" and, in response, Hill acknowledged that he had been fired by MDUMC. Dkt. # 40-11. Plaintiff was informed by Audra Ogle of the district youth counsel that he could not attend the April 2013 meeting, and the decision to prohibit Hill from attending the meeting was not made by anyone at MDUMC. Id. On June 27, 2013, MDUMC received notice that Hill had filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), which alleged that Hill's employment was terminated "for standing up for a coworker and because of [his] race." Dkt. # 40-1, at 21, 23. On July 12, 2013, Fletcher-Taylor notified the staff parish relations committee that Hill had filed a charge of discrimination with the EEOC. Dkt. # 40-1, at 26. Hill and his sister had volunteered to be ushers for services on July 7, 2013, but an amended bulletin was

5

published removing their names from the list of ushers. Dkt. # 40-14. There is no evidence as to who made the decision to remove Hill and his sister from the list of ushers for the July 7, 2013 service or that the person or persons making the decision knew of Hill's EEOC charge.

On October 23, 2013, Hill filed a civil action against MDUMC in Tulsa County District Court, alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Title VII) and 42 U.S.C. § 1981. The case was removed to federal court. Ladon E. Hill v. Memorial Drive United Methodist Church, 13-CV-745-JHP-TLW (N.D. Okla.). The parties filed a joint stipulation of dismissal and Hill's claims were dismissed without prejudice to refiling. On February 9, 2017, Hill refiled the case in Tulsa County District Court, and MDUMC removed the case to this Court. Hill alleges claims of racial discrimination and retaliation under § 1981. Dkt. # 2-2.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Defendant argues that plaintiff cannot establish a prima facie case of racial discrimination, because plaintiff has no evidence that he was treated differently than any other similarly situated employee who engaged in similar conduct. Dkt. # 37, at 9-10. Defendant also argues that plaintiff did not engage in any protected activity during his employment that would support a retaliation claim. Id. at 13. Plaintiff responds that he received five employee warning notifications on the same day and there is a genuine dispute as to a material fact as to whether race was a motivating factor in his termination. Dkt. # 40, at 12. He also claims that defendant retaliated against him following his termination, and he asserts that defendant retaliated against him in his capacity as a member of MDUMC for filing a charge of discrimination with the EEOC. Id. at 14.

7

**A.**

Plaintiff claims that race was a motivating factor in MCUMC's decision to terminate his employment. Plaintiff does not have direct evidence of discrimination and the Court must apply the McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis in reviewing plaintiff's claim of racial discrimination under § 1981.[1] Plaintiff must first establish a prima facie case of racial discrimination. Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008). To establish a prima facie case of racial discrimination based on a wrongful discharge theory, plaintiff is required to produce evidence raising a genuine dispute as to a material fact showing that "(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." EEOC v. PVNF, LLC, 487 F.3d 790, 800 (10th Cir. 2007). If plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to come forward with a legitimate non-discriminatory reason for any adverse employment action. Adamson v. Multi Community Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008). If the defendant provides a legitimate, non-discriminatory reason for its actions, the burden shift to the plaintiff to show that the defendant's explanation is pretextual. Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006).

---

[1] Even though plaintiff's petition does not contain a claim under Title VII, the McDonnell-Douglas analysis applies to plaintiff's § 1981 claim of racial discrimination and the Court considers plaintiff's § 1981 claim under the same standards applicable to Title VII claims of racial discrimination. See Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 (10th Cir. 2015) (racial discrimination claims for wrongful termination under Title VII and § 1981 are both subject to the burden-shifting analysis in cases not involving direct evidence of discrimination).

Defendant does not contest that plaintiff belongs to a protected class or that he suffered an adverse employment action, but defendant argues that plaintiff has no evidence tending to show that he was terminated because of his race. Plaintiff's primary argument is that he received five employee warning notifications on November 13, 2012, and he claims that the failure to give him warnings contemporaneously with the alleged misconduct suggests that defendant was seeking to build a case for his termination. Dkt. # 40, at 4, 12. He argues that defendant did not have an express policy prohibiting racial discrimination, and he claims that no Caucasian employees received warning notifications for the entire 2012 year. Id. at 12. He claims that two Caucasian church members interrupted a service and did not receive a warning. Id. at 5. Plaintiff also alleges that he complained about a racially discriminatory van policy. Id. at 7. A plaintiff's burden at the prima facie case stage is "not onerous" and the Court will assume that plaintiff can establish a prima facie case of racial discrimination. Ortiz v. Norton, 254 F.3d 889, 894 (10th Cir. 2001). The Court will consider the parties' arguments concerning the alleged discriminatory conduct as part of the pretext analysis.

Defendant states that it terminated plaintiff's employment after plaintiff damaged church property and engaged in repeated disruptive or inappropriate acts. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir.

2007). Defendant has stated a legitimate, non-discriminatory reason for terminating plaintiff's employment, and the Court must determine if plaintiff has produced sufficient evidence to show that a genuine dispute as to a material fact exists suggesting that defendant's stated reason is pretextual.

At this stage of the proceeding, the burden shifts to plaintiff to show that defendant's explanation for terminating his employment is pretextual. Plotke v.White, 405 F.3d 1092, 1099 (10th Cir. 2005); Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004). "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)). A plaintiff typically attempts to satisfy his burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment. Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).

Plaintiff argues that he was treated differently than similarly situated Caucasian employees. Plaintiff's entire argument concerning disparate discipline relies on his statement that two Caucasian members allowed youths to disrupt a service on November 4, 2012 and that two Caucasian church members interrupted a service on October 28, 2012. Dkt. # 40, at 5. The only evidence supporting these allegations is contained in plaintiff's responses to interrogatories, and the Court has reviewed plaintiff's discovery responses. Dkt. # 40-4, at 3. Plaintiff's allegations do not support his claim

10

that he was treated differently than similarly situated Caucasian employees. Plaintiff alleges that "two white male church members" interrupted a service on November 4, 2012, but plaintiff was a church employee and could reasonably be held to a different standard than a member of the church. Id. As to the incident on October 28, 2012, he claims that George DeShazo and Denny Redmon got up to adjust the thermostat during a sermon, but he does not allege that these persons were MDUMC employees. Id. at 3-4. Even if these persons were MDUMC employees, the alleged conduct is not comparable to the undisputed evidence that plaintiff grabbed a microphone during a service on October 28, 2012 and complained about the defendant's treatment of another employee. Dkt. # 37-1, at 18. In addition, plaintiff failed to supervise some of his youths on November 11, 2012 and at least one of the youths interrupted a service. Dkt. # 40-1, at 33. Plaintiff now claims that the incident was exaggerated or did not occur. Dkt. # 40, at 5. However, he did not deny the allegations when presented with an employee warning notification, and it was reasonable for defendant to rely on plaintiff's failure to properly supervise some of his youths in making a decision to terminate his employment. Dkt. # 40-1, at 33. The Court finds no evidence that similarly situated Caucasian employees were treated differently than plaintiff.

Plaintiff's remaining arguments fail to raise even an inference that defendant's stated reason for terminating his employment was pretextual. Plaintiff argues that defendant did not have an express policy prohibiting racial discrimination. However, plaintiff was an MDUMC employee since 2004 and he does not allege that MDUMC engaged in or tolerated the disparate treatment of any African-American employee, other than himself, during that time. Plaintiff argues that defendant enacted a discriminatory van policy that disproportionately impacted minority youths living more than two miles away from MDUMC. Dkt. # 40, at 7. It is true that plaintiff complained

11

about the van policy because "90 percent of our youth live more than 2 miles from this church." Dkt. # 37-14, at 2. Plaintiff did not complain about the policy on the ground that it was racially discriminatory, and he did make any allegation that the policy discriminated on the basis of race until he responded to defendant's discovery requests. Dkt. # 40-4, at 4. Plaintiff's complaint about the van policy does not tend to show that defendant discriminated against him or anyone else because of race. Finally, plaintiff argues that he received five employee warning notifications on one day, and he claims that the lack of contemporaneous discipline tends to show that defendant's stated reason for terminating his employment was pretextual. This argument would be more persuasive if plaintiff's employment had actually been terminated on November 13, 2012 when he received the notifications. Instead, there is evidence that defendant was seeking a way to avoid terminating plaintiff's employment if he could move on from the perceived mistreatment of a fellow employee, and his employment was terminated several months later after he continued to violate defendant's employment policies. See Dkt. # 37-11. Plaintiff has not come forward with any evidence tending to show that race had anything to do with his termination, and he has not raised a genuine dispute that defendant's stated reason for terminating his employment was pretextual. The Court finds that defendant is entitled to summary judgment on plaintiff's racial discrimination claim under § 1981.

**B.**

Defendant argues that plaintiff did not engage in any protected activity during his employment and there is no possibility that he could prevail on a retaliation claim.[2] Dkt. # 37, at 12-14. Plaintiff responds that he filed a charge of discrimination after his employment was terminated, and he was retaliated against in his capacity as a member of MDUMC for filing the charge. Dkt. # 40, at 8-10, 13-15.

Under Title VII, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). The Supreme Court has found that § 1981 encompasses acts of retaliation and a plaintiff can proceed with a retaliation claim under § 1981. CBOCS West, Inc. v. Humpries, 553 U.S. 442 (2008). The same standards apply to retaliation claims under Title VII and § 1981, and "the principles set for in Title VII retaliation cases apply with equal force in § 1981 retaliation cases." Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 998 (10th Cir. 2011). To prove a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the opposition and the adverse action. Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004). The law is clear that reporting workplace discrimination to the EEOC is protected behavior. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999); McCue v. State of Kansas, Dep't of Human Resources, 165 F.3d 784, 789 (10th Cir. 1999). An employee may establish

---

[2] Plaintiff argues that defendant did not move for summary judgment on his retaliation claim, and he claims that the Court cannot reach this issue. Dkt. # 40, at 7. Plaintiff is blatantly incorrect and defendant specifically moves for summary judgment on plaintiff's retaliation claim. Dkt. # 37, at 12-14. The Court rejects plaintiff's procedural argument that the Court cannot enter summary judgment as to his retaliation claim.

causation by showing that the adverse employment action occurred soon after the protected activity. Annett v. University of Kansas, 371 F.3d 1233, 1239-40 (10th Cir. 2004); Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982). "Unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009). If the employer comes forward with a legitimate, non-discriminatory reason for its actions, the burden shifts to the employee to show that employer's stated reason is pretextual. Id.

Defendant argues that plaintiff cannot prove the first element of a prima facie case of retaliation, because he did not file a charge of discrimination or even make an informal complaint of discrimination before his employment was terminated. Plaintiff does not contest this argument, but he argues that defendant engaged in post-termination conduct that could be considered an adverse employment action. Dkt. # 40, at 14. He cites Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), for the proposition that acts of retaliation are not limited to the workplace and an employee can bring a retaliation claim based on harm that occurs outside of the workplace. The Supreme Court found that the "scope of the antiretaliation provision extends beyond the workplace-related or employment-related retaliatory acts harm." Id. at 67. However, the "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces injury or harm." Id. A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it might well have 'dissuaded

14

a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (quoting Rochon v. Gonzalez, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The Tenth Circuit has found that post-termination conduct by an employer can qualify as retaliation if the conduct is intended to dissuade the employee from engaging in protected activity. Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079 (10th Cir. 2007).

This case presents a situation in which plaintiff voluntarily maintained a relationship with his former employer after his employment was terminated. Plaintiff chose to remain a member of the church community after his employment was terminated, and this is distinguishable from cases where a defendant reached out to harm a plaintiff's personal life or future employment prospects based on an allegedly retaliatory motive. See Williams, 497 F.3d at 1090 (former employer allegedly interfered with a former employee's claim for unemployment benefits and threatened to spread rumors of sexual misconduct to discourage the employee from pursuing a charge of discrimination). Plaintiff voluntarily remained a member of the church after his termination, and he could be treated in the same manner as any other person who attended the church. Plaintiff complains that defendant "disparaged" him by publishing notices that he was no longer an employee and advising church members that defendant would not be responsible for children placed in plaintiff's care. Dkt. # 40-13, at 2. Plaintiff may have been personally upset that church members were advised that he was no longer an employee, but it was a true statement and it was reasonable for defendant to advise its members of the change in plaintiff's employment status given the nature of his work. Plaintiff's own conduct made this particularly important, because plaintiff was not forthcoming about the change in his employment status and he led others to believe that he was still an MDUMC employee. Dkt. # 40-2, at 7. Plaintiff claims that he did not expressly state that he was

15

still employed by defendant when he attended a youth council meeting on March 3, 2013, but he clearly states that the youth council leader did not know that he had been terminated and he did not volunteer this information. Id. The Court does not find that MDUMC's publication of notice that plaintiff was no longer an employee can viewed as a retaliatory act for the purpose of liability under § 1981.

After he filed a charge of discrimination, he claims that, on July 12, 2013, defendant advised many of its members that plaintiff had filed a charge "against all of us" and that defendant was in communication with an attorney. Dkt. # 40-12. He states that he was confronted by church members about his allegations of racial discrimination. Dkt. # 40-4, at 5-6. The fact that individual members of the church may have confronted plaintiff does not show that defendant was retaliating against plaintiff. Plaintiff has produced no evidence that any of these persons were speaking on behalf of MDUMC as his former employer or that defendant sanctioned or encouraged this conduct. There is also no temporal connection between his former employer's publication of this information and the alleged harassment. The information about plaintiff's charge of discrimination was published on July 12, 2013, and plaintiff's discovery responses state that alleged incidents of harassment occurred in 2014 and 2015. Dkt. # 40-4, at 5-6. This shows that plaintiff continued to attend the church well after defendant notified its members about the charge of discrimination, and the alleged harassment was not so pervasive that plaintiff felt that he could no longer attend services at the church. Plaintiff claims that he was not permitted to be an usher in July 2013, and he claims that this was retaliation for his decision to file a charge of discrimination. The Court finds that this is not the type of action that can be considered materially adverse, because it is not such a severe action that it suggests that a reasonable person would be discouraged from proceeding with a charge

of discrimination. Even if it could be materially adverse, plaintiff was replaced as an usher before news of his charge of discrimination had been published to church members, and he has no evidence that the person or persons who removed him as an usher knew of the charge of discrimination. See Dkt. # 40-14 (amended church bulletin published on July 7, 2013, which was before the July 12, 2013 e-mails giving notice to church members that plaintiff had filed a charge of discrimination). The Court finds that the alleged post-termination retaliation committed by defendant either cannot be linked to defendant acting in its capacity as plaintiff's former employer or cannot be considered materially adverse, and plaintiff cannot establish a prima facie case of retaliation under § 1981. Summary judgment should be entered in favor of defendant on plaintiff's retaliation claim under § 1981.

**IT IS THEREFORE ORDERED** that Defendant Memorial Drive United Methodist Church's Motion for Summary Judgment and Brief in Support (Dkt. # 37) is **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Plaintiff's Unopposed Motion to Strike Deadlines (Dkt. # 44) is **moot**.

**DATED** this 20th day of February, 2018.

*[signature]*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE